**FILED**
**CLERK**

3/24/2016 1:51 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
HEMING TAN,

     Plaintiff,

   -against-

SMS INVESTMENT GROUP, LLC and
AHN & ASSOCIATES, LLC,

      Defendants.
--------------------------------------------------------X

**MEMORANDUM OF**
**DECISION & ORDER**
15-CV-3719(ADS)(ARL)

**APPEARANCES:**

**Warshaw Burstein LLP**
*Attorneys for the Plaintiff*
555 Fifth Avenue
New York, NY 10017
  By: Grant R. Cornehls, Esq., Of Counsel

**Oshman & Mirisola**
*Attorneys for the Defendants*
42 Broadway, 10th Floor
New York, NY 10024
  By: David L. Kremen, Esq., Of Counsel

**SPATT, District Judge**.

  This is an action for breach of contract and breach of fiduciary duty arising from an investment by the Plaintiff Heming Tan (the "Plaintiff") in a limited liability company formed by the Defendants Ahn & Associates, LLC ("A&A") and SMS Investment Group, LLC ("SMS" and collectively, the "Defendants").

  Presently before the Court is a motion by the Defendants pursuant to the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 12(b)(2) and 12(b)(3) to dismiss the complaint for lack of personal jurisdiction and improper venue. In the alternative, the Defendants move pursuant to 28 U.S.C. § 1404(a) to change venue to the Northern District of Georgia.

For the reasons set forth below, the Court grants the Defendants' 12(b)(2) motion.

## I. BACKGROUND

Unless otherwise stated, the following allegations are drawn from the complaint.

The Plaintiff commenced this action on June 25, 2015, asserting claims against the Defendants for breach of contract and breach of fiduciary duty.

The complaint states that the Plaintiff is a citizen of the Republic of Singapore and currently resides within this District, in Brookville, New York.

According to the complaint, the Defendant A&A is a Georgia limited liability company, with its principal place of business located in Dunwoody, Georgia. Allegedly, in 2009, A&A formed the Defendant SMS for the purpose of raising money to invest in another company known as ALTe, LLC ("ALTe"). In a declaration filed in support of the Defendants' motion, Simon Ahn ("Ahn"), the managing and general partner of A&A, described ALTe as a "company located in Auburn Hills, Michigan that develops and produces hybrid electric powertrain solutions for commercial fleet vehicles." (Ahn Reply Decl., Dkt. No. 24–1, at ¶ 7.)

SMS is a Nevada limited liability company, which also has its principal place of business located in Dunwoody, Georgia.

With regard to jurisdiction, the complaint states, "The Court has original jurisdiction to hear this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000 and there is complete diversity of citizenship among the parties."

With regard to venue, the complaint states, "Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred within this District."

Turning to the substantive allegations, the complaint alleges that A&A and SMS sought to raise money to invest in ALTe by selling limited partnership investments in SMS to non-U.S. citizens. Each of the limited partnership investments in SMS was intended to be a Qualifying Investment under the Immigrant Investor Program ("EB-5 Program") administered by the United State Citizenship and Immigration Services ("USCIS"). According to the complaint, "[t]he EB-5 Program provides visas and conditional permanent residency to foreign investors who, under certain terms and conditions, create full-time employment in the United States." Under the EB-5 Program, a foreign investor is required to file an initial petition for adjustment of status or admission to the United States on form I-526, together with supporting documentation. Apparently, investors in SMS hoped to obtain conditional permanent residency in the United States through the EB-5 Program.

On April 12, 2012, the Plaintiff and the Defendants entered into a Subscription Agreement (the "Subscription Agreement"). The complaint alleges that under the terms of the Agreement, the Plaintiff agreed to invest, and did invest, $530,000 in SMS in exchange for one Unit of Limited Partnership in SMS. The investment was comprised of a $500,000 capital investment in SMS and a $30,000 "management/processing fee," which was to be paid to A&A.

In addition, the complaint states that the Subscription Agreement provides for a refund of all monies paid by the Plaintiff in the event his I-526 petition is denied by USCIS, or a partial refund if the Plaintiff elects to cancel his subscription. To that end, the Subscription Agreement allegedly stated the following:

> I acknowledge that if my I-526 or I-829 Immigrant Visa petition or adjustment of status application is rejected by the USCIS for any reason . . . I shall be entitled to a refund as follows:
>
> 1. The refund will be 100% of all monies I have paid if my I-526 petition and/or Immigrant Visa or adjustment of status as a conditional lawful permanent resident

is denied at any stage or for any reason (other than misrepresentation by me). The refund will be provided within thirty (30) days after written notification of the denial by either USCIS or the U.S. Consulate.

2. If I decide to cancel my subscription for SMS before I go to my Immigrant Visa interview or before I am granted adjustment of status, I may do so, but I shall receive a refund of only $475,000 of my capital investment. Said refund shall be provided with [sic] ninety (90) days of written notice of cancellation. The remaining $25,000.00 shall be payable to SMS as liquidated damages, and the management/processing fee shall not be refundable. Further, once I received my Immigrant Visa, I cannot receive a refund.

(Compl. at ¶ 17.)

Allegedly, on December 10, 2015 — before going to his immigrant visa interview and before a decision on his application for conditional permanent resident status —, the Plaintiff notified the Defendants that he elected to cancel his subscription and demanded a refund under the Agreement in the amount of $475,000.

The Defendants have failed to pay the Plaintiff his refund. Accordingly, the Plaintiff asserts that the Defendant breached the Subscription Agreement "by failing to refund the portion of the Plaintiff's capital contribution that is due to him" and seeks at least $475,000 in damages.

In addition, the Plaintiff alleges that A&A, as the general partner of SMS, owed him, as a limited partner, a fiduciary duty to "hold [his] investment pending the approval of his I-526 petition, or to otherwise provide for the return of his investment in the event that his petition was denied or he elected to cancel his subscription." Accordingly, the complaint alleges that A&A breached its fiduciary duty to the Plaintiff by "failing to hold the Plaintiff's investment."

On July 30, 2015, the Defendants filed an answer denying the substance of the Plaintiff's breach claims. To that end, they assert as a defense that the Plaintiff "deliberately delayed his U.S. Consulate interview and failed to deliver required documents to SMS and/or A&A as prescribed in the Subscription Agreement." As such, they contend that the Plaintiff cannot claim

4

a refund under the Agreement. In addition, among other affirmative defenses, the answer asserts that this Court lacks personal jurisdiction over the Defendants and that venue in this District is improper.

On August 21, 2015, the Defendants filed the present motion to dismiss the complaint for (A) lack of personal jurisdiction, (B) improper venue, and (C) in the alternative, to request a transfer of venue to the Northern District of Georgia.

The Court will address each issue, in turn.

## II. DISCUSSION

### A. The Legal Standard

"'A plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit.'" Troma Entm't, Inc. v. Centennial Pictures Inc., 729 F.3d 215, 217 (2d Cir. 2013) (quoting Penguin Group (USA) Inc. v. American Buddha, 609 F.3d 30, 34 (2d Cir. 2010)). "[T]he showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'" Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A., 722 F.3d 81, 84 (2d Cir. 2013) (quoting Ball v. Metallurgie Hoboken–Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990)). A court "may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion." Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981) (citing Visual Sciences, Inc. v. Integrated Communications Inc., 660 F.2d 56 (2d Cir. 1981)). If it chooses to decide a motion on the basis of the pleadings and affidavits alone, a plaintiff need only make a *prima facie* showing that the court has personal jurisdiction over the defendants, which the Second Circuit has defined as "'an averment of facts that, if credited by the trier, would suffice to establish

jurisdiction over the defendant.'"  <u>Dorchester Fin. Sec., Inc.</u>, 722 F.3d at 84 (quoting <u>Ball</u>, 902

F.2d at 197).  Significantly, at this stage, a court can consider "materials outside the pleadings"

but must also "assume[] the truth of the plaintiff's factual allegations."  <u>Id.</u> (quoting <u>Ball</u>, 902

F.2d at 197).  However, the court need not "'accept as true a legal conclusion couched as a

factual allegation.'"  <u>Jazini v. Nissan Motor Co.</u>, 148 F.3d 181, 185 (2d Cir. 1998) (quoting

<u>Papasan v. Allain</u>, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L.Ed.2d 209 (1986)).

      "As a general rule, 'the amenability of a foreign corporation to suit in a federal court in a

diversity action is determined in accordance with the law of the state where the court sits, with

'federal law' entering the picture only for the purpose of deciding whether a state's assertion of

jurisdiction contravenes a constitutional guarantee.'"  <u>Bank Brussels Lambert v. Fiddler

Gonzalez & Rodriguez</u>, 171 F.3d 779, 784 (2d Cir. 1999) (quoting <u>Arrowsmith v. United Press

Int'l</u>, 320 F.2d 219, 223 (2d Cir.1963) (en banc)).  Therefore, district courts must engage in a

two-step analysis when resolving issues of personal jurisdiction: (i) "they must determine

whether there is jurisdiction over the defendant under the relevant forum state's laws"; and (ii)

"they must determine whether an exercise of jurisdiction under these laws is consistent with

federal due process requirements."  <u>Id.</u>

      The Plaintiff asserts that the Court can exercise personal jurisdiction over the out-of-state

Defendants pursuant to New York's Long Arm Statute, Section 302 of the New York Civil

Practice Law and Rules ("Section 302").  (<u>See</u> the Pls.' Mem. of Law, Dkt. No. 21, at 6.)

Section 302 provides in relevant part, that "a court may exercise personal jurisdiction over any

non-domiciliary . . .  who in person or through an agent: (a) transacts any business within the

state or contracts anywhere to supply goods or services in the state"; or (b) "commits a tortious

act without the state causing injury to person or property within the state, . . . , if he (i) regularly

does or solicits business, or engages in any other persistent course of conduct, or derives

substantial revenue from goods used or consumed or services rendered, in the state, or (ii)

expects or should reasonably expect the act to have consequences in the state and derives

substantial revenue from interstate or international commerce." N.Y. C.P.L.R. 302(a)(1), (3).

**B. As to Whether the Defendants Transacted of Business Within the State**

### 1. The Parties' Positions and the Relevant Evidence

As noted, the Plaintiffs first assert that this Court has jurisdiction over the Defendants

pursuant to Section 302(a)(1), which states that a court can exercise personal jurisdiction on an

out-of-state defendant "who in person or through an agent . . . transacts any business within the

state or contracts anywhere to supply goods or services in the state."

Here, it is undisputed that the Defendant A&A is a Georgia limited liability company,

with its principal place of business in Georgia, and the Defendant SMS is a Nevada limited

liability company with its principal place of business in Georgia. The complaint provides no

details regarding the negotiations between the Plaintiff and the Defendants. Nor does the

complaint specify what contacts the Defendants had in New York other than the Plaintiff.

For that reason, the Defendants assert that the complaint fails to plausibly allege that they

transacted business in New York State for purposes of Section 302(a)(1). (See the Defs.' Mem.

of Law, Dkt. No. 15–5, at 13.) In support of their motion, they filed a declaration by Ahn —

who as noted above, was the managing general partner of A&A — in which he states that SMS

and A&A do not have offices in New York; do not have bank accounts in New York; do not

have employees in New York; do not "perform an activities of work of any nature in New

York"; and do not possess real property situated in New York. (Ahn Decl., Dkt. No. 15–4, at ¶¶

6–9, 11.) In addition, Ahn states that the Defendants never "solicited business from [the

Plaintiff] or talked to [Plaintiff] about the investment into SMS." (Id. at ¶ 10.) Further, according to Ahn, the only communication that the Defendants had with the Plaintiff was on December 10, 2015, when he elected to terminate the Subscription Agreement and sought a partial refund of his investment in the amount of $475,000. (Id. at ¶ 14.)

In response, the Plaintiff offers the declaration of Peter J. Jensen, Esq. ("Jensen"). Jensen asserts that he is an immigration attorney for the firm, Jensen & Jensen, which maintains offices in New York County and Flushing, Queens. (Jensen Decl., Dkt. No. 19, at ¶ 2.) Through his work, Jensen states that he has "come into contact with individuals who are interested in immigrating to the United States from China[.]" (Id.) According to Jensen, in late 2009, Ahn reached out to Jensen to ask whether Jensen, "through [his] network of contacts, could put [Ahn] in contact with individuals who would be interested in investing, as EB-5 investors, in various investment projects that [Ahn] would manage," including the SMS/ALTe investment project at issue here. (Id. at ¶ 4.) Jensen allegedly agreed to assist Ahn and "acted as an intermediary between his companies and Chinese licensed migration agencies in China who could refer potential EB-5 investors[.]" (Id. at ¶ 5.) Subsequently, "[t]hrough [Jensen's] contacts with the Chinese community in New York and Chinese migrations agencies in China, Mr. Ahn successfully recruited ten to twelve EB-5 investors in SMS, including [the Plaintiff]." (Id. at ¶ 12.)

With regard to the Plaintiff, Jensen asserts that at an unspecified time, "one of his contacts" introduced Ahn to the Plaintiff, who at the time was a resident of Brookville, Long Island. (Id. at ¶ 6.) Jensen further states:

> I acted as the authorized representative of Mr. Ahn . . . to facilitate Mr. Tan's investment. Mr. Ahn personally drafted and sent to my office in New York the standard form Subscription Agreement that was provided to investors in SMS and executed by Mr. Tan.

8

(Id. at ¶ 13.)

With Jensen's assistance, Ahn also created SMS Investment Group IV, LLC ("SMS IV") and Green Detroit Regional Center, LLC ("GRDC"), two entities that, like the Defendants, sought to obtain funding from Chinese investors. (Id. at ¶ 9, 11.) In connection with SMS IV, Ahn allegedly created three New York bank accounts. (Id. at ¶ 12.) Further, according to Ahn, from 2009 to 2012, Ahn "regularly made numerous phone calls and regularly sent e-mails to [Jensen's] office in New York relating to these investment projects." (Id. at ¶ 8.) In 2010, Ahn visited Jensen's office in New York to discuss "investments in various SMS investment projects." (Id. at ¶ 8.)

The Plaintiff also submits a declaration in support of his opposition memorandum. (See Tan Decl., Dkt. No. 20.) In the declaration, the Plaintiff states that he executed the Subscription Agreement at his home in Brookville, New York. (Id. at ¶ 3.) To support this assertion, he attaches a copy of the Subscription Agreement, which lists his "address" as a residence located in Brookville. (Jensen Decl., Ex. E, at p. 3.)

Based on these declarations, the Plaintiff argues that the Court should deny the Defendants' motion because through the Defendants' activities in New York in contracting with Tan and using Jensen as an "authorized representative" to solicit New York investors in the Chinese community, the Defendants "purposely availed themselves" of this Court's jurisdiction. (See the Pl.'s Mem. of Law, Dkt. No. 21, at 7–8.)

In reply, the Defendants filed another declaration by Ahn denying many of the statements made in Jensen's declaration. Specifically, Ahn states that he hired Jensen as a consultant because of his contacts with potential investors in China, not New York. (Ahn Reply Decl., Dkt. No. 24–1, at ¶ 10.) Ahn also alleges that on October 28, 2011, he terminated his relationship

with Jensen.  (Id. at ¶ 11.)  Accordingly, the Defendants assert that they did not authorize Jensen to solicit the Plaintiff on their behalf and were not otherwise involved in the negotiations which led to the Plaintiff signing the Subscription Agreement on April 12, 2012.

Accordingly, the Defendants assert that "under these circumstances . . . it cannot be said that [they] were transacting business in New York, in person or through an agent[.]"  (The Defs.' Mem. of Law, Dkt. No. 24, at 4–5.)

## 2. The Relevant Legal Standards

"It is well settled that in order for a court to obtain personal jurisdiction over a party under the 'transaction of business' prong of [Section] 302(a)(1), the party need not be physically present in the state at the time of service."  Bank Brussels Lambert, 171 F.3d at 787.  Rather, Section 302(a)(1) "extends the jurisdiction of New York state courts to any nonresident who has 'purposely availed [himself or herself] of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws[.]"  Id. (quoting Parke–Bernet Galleries v. Franklyn, 26 N.Y.2d 13, 16, 308 N.Y.S.2d 337, 256 N.E.2d 506 (N.Y. 1970)).

"Determining whether long-arm jurisdiction exists under the 'transacts business' provision of NY CPLR 302(a)(1), is a two-pronged inquiry: 'a court must decide (1) whether the defendant transacts any business in New York and, if so, (2) whether [the] cause of action aris[es] from such a business transaction'"  Wilson v. Dantas, 128 A.D.3d 176, 181, 9 N.Y.S.3d 187, 192 (Second Dep't 2015) (quoting Licci v. Lebanese Canadian Bank, 20 N.Y.3d 327, 334, 984 N.E.2d 893, 897 (N.Y. 2012)); see also Best Van Lines, Inc. v. Walker, 490 F.3d 239, 246 (2d Cir. 2007) (same).

With regard to the first prong of the analysis, "[t]o determine whether a party has 'transacted business' in New York, courts must look at the totality of circumstances concerning

the party's interactions with, and activities within, the state." Bank Brussels Lambert, 171 F.3d at 787. The Second Circuit has pointed to several relevant factors that courts should consider in making this determination, including:

> (i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state.

Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 22 (2d Cir. 2004) (quoting Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp., 98 F.3d 25, 29 (2d Cir. 1996)).

With regard to the second prong of the analysis, "[i]n order for a cause of action to 'arise out of a party's activities in New York, there must be 'an articulable nexus,' or a 'substantial relationship,' between the claim asserted and the actions that occurred in New York." Kronisch v. United States, 150 F.3d 112, 130 (2d Cir. 1998). "In effect, the 'arise-from' prong limits the broader 'transaction-of-business' prong to confer jurisdiction only over those claims in some way arguably connected to the transaction." Licci, 20 N.Y.3d at 339-40, 984 N.E.2d 893.

Ultimately, the determination of whether Section 302(a)(1) confers jurisdiction over an out-of-state defendant is a highly fact-intensive inquiry that depends on the "nature and quality of a defendant's New York contacts." Anderson v. Indiana Black Expo, Inc., 81 F. Supp. 2d 494, 501 (S.D.N.Y. 2000).

For example, the Plaintiff relies on George Reiner & Co. v. Schwartz, 41 N.Y.2d 648, 363 N.E.2d 551 (1977). There, the plaintiff, a New York company, asserted breach of contract and fraud claims against a former sales employee, a Massachusetts resident, who was located in Massachusetts and solicited potential clients located in New England. Id. at 649. The New York

Court of Appeals found that the defendant transacted business within the meaning of Section 302(a)(1) because he was "physically present in New York at the time the contract . . . was negotiated and made." Id. at 653. The Court further reasoned that "the defendant's coming into New York purposefully seeking employment, his interview and his entering into an agreement with a New York employer which contemplated and resulted in a continuing relationship between them, certainly are of the nature and quality to be deemed sufficient to render him liable to suit here." Id.

Similarly, he cites to Matera v. Native Eyewear, Inc., 355 F. Supp. 2d 680, 685 (E.D.N.Y. 2005) (Spatt, J). In that case, the plaintiff, a sun glasses designer and resident of Nassau County, asserted breach of contract claims against the defendant-manufacturer seeking to recover royalty payments under a consulting agreement. Id. at 682–83. In ruling that jurisdiction was appropriate under Section 302, this Court found it significant that the agreement "contemplated an ongoing contractual agreement" over several years; the plaintiff rendered his services in Nassau County; and the parties had a "long-standing working relationship and "communicated via written communications, e-mail, and telephone." Id. at 684–86.

By contrast, in Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, *supra*, the plaintiff, a foreign bank with offices in New York, brought suit for fraud and breach of fiduciary duties against a Puerto Rican law firm in connection with a legal opinion it provided to the plaintiff and several other banks required in the closing of a security agreement with two oil companies. 171 F.3d at 782–83. The Second Circuit found that the law firm did not transact business in New York for purposes of Section 302 because the firm was "located and incorporated in Puerto Rico . . . , it performed all of its legal research and writing services in preparing the [] opinion and closing the relevant security documents in Puerto Rico, and none of

its partners or agents either entered New York or were required to be physically present to perform any of these services." Id. at 787. Furthermore, the court noted that although the firm had solicited business from New York corporations in the past, "the present action does not arise out of any alleged New York business solicitations, as would be required for § 302(a)(1) jurisdiction premised on solicitations." Id. Thus, it found those contacts insignificant for purposes of jurisdiction under Section 302. See id.; see also AVRA Surgical Robotics, Inc. v. Gombert, 41 F. Supp. 3d 350, 359 (S.D.N.Y. 2014) ("Even if their truth is assumed, the allegations do not suggest that any wrongful activity arose out of Gombert's alleged transaction of business in New York. Rather, all the relevant alleged conduct occurred thousands of miles away in Germany. Moreover, the contracts and duties allegedly breached were formed and executed in Germany. To the extent that Gombert did transact business in New York by attending AVRA's board meeting and conferring with investors, the complaint does not establish how, if at all, these activities relate — much less substantially relate — to the causes of actions pled.").

The Plaintiff also relies on cases in which courts have found that an out-of-state defendant has "transacted business" in the State "through an agent." In that regard, "New York courts have held that a Section 302(a)(1) determination as to whether defendant has transacted business 'through an agent' does not require a formal agency relationship." Anderson, 81 F. Supp. 2d at 503. Instead, "courts focus on the 'realities of the relationship in question' to determine whether the agent acted in New York 'for the benefit of, and with the knowledge and consent of the non-resident principal.'" Id. (quoting Alto Prods. Corp. v. Ratek Indus. Ltd., No. 95 Civ. 3314, 1996 WL 497027(LMM), at *3 (S.D.N.Y. September 3, 1996)); see also Becker v. DPC Acquisition Corp., No. 00 CIV 1035 (WK), 2001 WL 246385, at *5 (S.D.N.Y. Mar. 13,

2001) ("Under C.P.L.R. § 302(a), we may assert jurisdiction over a party who 'transacts business' through an agent. To test jurisdiction, courts in this District do not rely on the formalities of agency law.") (citing <u>CutCo Indus., Inc. v. Naughton</u>, 806 F.2d 361, 366 (2d Cir. 1986)).

For example, the Plaintiff cites to <u>Parke-Bernet Galleries, Inc. v. Franklyn</u>, 26 N.Y.2d 13, 256 N.E.2d 506 (1970). There, the defendant, a California resident, reached out to the plaintiff, a New York auctioning firm, to seek assistance in participating in an auction being held by the plaintiff at its offices in New York. <u>Id.</u> at 15. During the auction, the defendant relayed his bids from California over the phone to one of the plaintiff's employees, who was then present at the auction in New York. <u>Id.</u> at 15–16. Ultimately, the defendant successfully bid on two pieces of art, and when he subsequently failed to pay for them, the plaintiff sued him in New York State Court. <u>Id.</u>

The Court of Appeals in <u>Parke-Bernet</u> found that the defendant had "transacted business" for purposes of Section 302(A)(1) for two reasons. First, the court found it "highly significant that, on his own initiative, the defendant, in a very real sense, projected himself into the auction room in order to compete with the other prospective purchasers who were there. This activity far exceeded the simple placing of an order by telephone." <u>Id.</u> at 18. Thus, according to the court, the defendant's actions alone provided "ample basis" for concluding that he "'purposefully availed' himself 'of the privilege of conducting activities' within New York and thereby 'invok[ed] the benefits and protections of its laws' relating to the conduct of auctions." <u>Id.</u> Second, the court found that there was also "substantial ground for concluding . . . that [the plaintiff's employee], who, of course, was physically present in the New York auction room, was engaged as the defendant's agent at the time." <u>Id.</u> at 18; <u>see also</u> <u>Nat'l Cathode Corp. v. Mexus</u>

Co., 855 F. Supp. 644, 647 (S.D.N.Y. 1994) ("Accordingly, this Court finds — based on the fact that agents of the defendants physically entered New York and engaged in discussions that were essential to formation of the contract at the heart of this action — that defendants have transacted business in New York such that jurisdiction over defendants exists pursuant to § 302(a)(1) and due process requirements.").

However, and importantly, "an agent may not rely upon his or her own New York contacts on behalf of a principal to establish long-arm jurisdiction." Fischbarg v. Doucet, 9 N.Y.3d 375, 383, 880 N.E.2d 22 (N.Y. 2007). For example, in Glassman v. Hyder, 23 N.Y.2d 354, 244 N.E.2d 259, 260 (N.Y. 1968), the defendants, owners of buildings in New Mexico, entered into a brokerage contractor with the plaintiff, a New York real estate broker, to find a buyer for their properties. Id. at 357. The plaintiff sued the defendants in New York State Court to recover a commission on a deal that the defendants had initially accepted but at the last minute decided not to consummate. See id. In analyzing the defendants' contacts in New York, the New York Court of Appeals noted that "[t]he acts of the independent broker within New York should not . . . be attributed to the owners so as to become acts of the owners in New York." Id. at 263. In this case, it was the broker who offered his services to the defendant and it was the broker who found the prospective buyer. See id. As the activities surrounding the broker agreement and the efforts to obtain a buyer for the defendants' properties were undertaken primarily by the broker, and not the defendants, the court found that the defendants had not "transacted business" in New York state for purposes of Section 302. See id.

### 3. The Application

As an initial matter, the Court notes that because discovery in this case has not commenced and there has not been an evidentiary hearing to resolve the jurisdictional issues of

fact, the Plaintiff need only make a *prima facie* showing of jurisdiction, and the Court must "construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." Dorchester Fin. Sec., Inc., 722 F.3d at 85. Thus, to the extent that the Defendants' declarations create issues of fact as to the Defendants' contacts in New York, those issues of fact will be construed in the Plaintiff's favor. See In re Terrorist Attacks on Sept. 11, 2001, 714 F.3d 659, 673 (2d Cir. 2013) ("'The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits. If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's *prima facie* showing is sufficient notwithstanding the contrary presentation by the moving party.'") (quoting parenthetically Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala, 989 F.2d 572, 580 (2d Cir.1993)).

However, even construing the allegations in the complaint and the facts contained in the Plaintiff's declarations as true, the Court finds that the Plaintiff has failed to make a *prima facie* showing of jurisdiction pursuant to Section 302(a)(1).

The Defendants did not negotiate with Tan over the terms of the Subscription Agreement. Rather, according to Jensen's affidavit, Ahn, the Managing Partner of the Defendant A&A, drafted a standard form subscription agreement to be used for all investors in SMS and ALTe. (Jensen Decl., Dkt. No. 19, at ¶ 13.) While the Plaintiff executed the Subscription Agreement at his home in New York, he did not have any direct contacts with the Defendants prior to doing so. (See id.) Nor did the Defendants come to New York with the express purpose of meeting with Tan to discuss their relationship and obligations under the Subscription Agreement.

Further, the Subscription Agreement did not contemplate an ongoing employment relationship with the Plaintiff. Specifically, the Subscription Agreement required the Plaintiff to

send $530,000 to the Defendants, whose business was located out-of-state, in exchange for a *limited* partnership interest in the company. (See Tan Decl., Ex. E, Dkt. No. 20-1, at p. 1.) The Agreement does not require the Plaintiff to perform any services on behalf of the Defendant other than furnishing them with his initial investment. Rather, as alleged in the complaint, the Plaintiff's investment in the Defendants was made for the primary purpose of qualifying for an EB-5 visa and conditional permanent residency. (See Compl. at ¶ 4, 13) (noting that "each of the limited partner investments in SMS is intended to be a Qualifying Investment under the EB-5 Program administered by USCIS").

In light of the passive nature of the Plaintiff's investment in the Defendants' business and the lack of any contact or negotiations between the parties prior to the Plaintiff signing the Subscription Agreement, the court cannot say that the Defendants "engaged in such a continuous and systematic course of 'doing business' here as to warrant a finding of its presence in this jurisdiction." Kulas v. Adachi, No. 96 CIV. 6674 (MBM), 1997 WL 256957, at *3 (S.D.N.Y. May 16, 1997) (quoting McGowan v. Smith, 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 645 (1981)); see also Bank Brussels Lambert, 171 F.3d at 787 (finding that the defendant did not "transact" business in New York because the defendant was "a law firm located and incorporated in Puerto Rico. It performed all of its legal research and writing services in preparing the [its] opinion and closing the relevant security documents in Puerto Rico, and none of its partners or agents either entered New York or were required to be physically present to perform any of these services.").

Furthermore, this is not a case where the Defendants were present in New York for the negotiations of the Subscription Agreement. See George Reiner, 41 N.Y.2d 6 at 653 ("Here, Schwartz was physically present in New York at the time the contract, establishing a continuing

17

relationship between the parties, was negotiated and made and, the contract, made in New York, was the transaction out of which the cause of action arose."). Nor is it a case where the Agreement contemplated that the Plaintiff would perform services in New York for the benefit of the Defendants over a sustained period of time. See Matera, 355 F. Supp. 2d at 685 ("[T]he Agreement provided that [the plaintiff] should devote an average of 15 hours per week on behalf of the [d]efendant and also provide to the [d]efendant 'marketing services and technical support regarding the manufacturing, packaging, promotion, and advertising of the Designs which are covered by this Agreement.'"). Accordingly, the Court does not find Reiner or Matera, two of the cases relied on by the Plaintiff, to be analogous to this case.

The Plaintiff also points to other contacts that the Defendants had in New York. According to Jensen, he assisted the Defendants in setting up and obtaining investors for GRDC SMS IV. (See Jensen Decl., Dkt. No. 19, at ¶¶ 9–11.) Allegedly, the Defendants setup three York bank accounts in New York to help Jensen secure funding for these projects. (Id. at ¶ 11.) However, SMS IV and GRDC are not related to SMS or ALTe, the entities in which the Plaintiff invested his money. Accordingly, the Defendants' actions with regard to GRDC and SMSIV appear to be unrelated to the Plaintiff's investment and the Subscription Agreement, and therefore, are not relevant for purposes of Section 302(a)(1). See Bank Brussels Lambert, 171 F.3d at 787 ("Although may have solicited some business from New York corporations through telefaxes, . . . , the present action does not arise out of any alleged New York business solicitations, as would be required for § 302(a)(1) jurisdiction premised on solicitations.").

Finally, even construing the statements in Jensen's declaration as true, the Court does not find that the relationship between Jensen and the Defendants is sufficient to render the Defendants subject to suit in this forum pursuant to Section 302(a)(1). "An agency relationship

exists where the alleged agent 'engage[s] in purposeful activities in this State . . . for the benefit of and with the knowledge and consent of' the alleged principal, <u>and the principal exercised some control over the agent</u>." <u>Kulas v. Adachi</u>, 1997 WL 256957 at *4 (emphasis added) (citing <u>Kreutter v. McFadden Oil Corp.</u>, 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 199 (1988)).

Thus, even if true, the fact that the Defendants hired Jensen to find potential Chinese investors is not, by itself, sufficient to plausibly establish an agency relationship between Jensen and the Defendants. That is because there is no indication in the complaint or in Jensen's affidavit that the Defendants had control over Jensen's activities in New York. Jensen alleges that Ahn made "numerous telephone calls and regularly sent numerous emails to [Jensen's] office in New York relating to . . . investment projects" and personally visited Jensen's office on one occasion. (Jensen Decl., Dkt. No. 19, at ¶ 8.). However, Jensen does not describe the explicit purpose or content of these communications, nor whether any of them related to the ALTe project or the Plaintiff's investment, as opposed to the other projects which Jensen was assisting Ahn with.

Rather, according to his own words, Jensen relied on his relationships in the New York Chinese community, not contacts of the Defendants, to find potential investors. Specifically, in his declaration, he stated, "<u>[t]hrough my contacts with the Chinese community in New York</u> and Chinese migration agencies in China, Mr. Ahn successfully recruited ten to twelve EB-5 investors in SMS, including [the] Plaintiff[.]" (<u>Id.</u> at ¶ 12) (emphasis added). In this way, Jensen functioned more like the independent real estate broker in <u>Glassman</u> than the auctioneer in <u>Parke-Bernet</u>, who was merely relaying the Defendants' bid to a New York audience.

For this reason, the Court finds that Jensen's acts in New York cannot be attributed to the Plaintiff, and their relationship does not establish that the Defendants were doing business in

New York.  See Fischbarg, 9 N.Y.3d at 383 ("We have previously held that an agent may not rely upon his or her own New York contacts on behalf of a principal to establish long-arm jurisdiction."); Glassman, 23 N.Y.2d at 362 ("The acts of the independent broker within New York should not, however, be attributed to the owners so as to become acts of the owners in New York."); Kulas, 1997 WL 256957 at *4 ("Here, plaintiff does not allege any facts from which it can be inferred that SonicStar operates as KK Adachi's agent in New York. SonicStar's development of the sterilizer benefits both itself and KK Adachi. Further, plaintiff does not allege that KK Adachi controls SonicStar's activities in developing the sterilizer, only that it is aware of these activities. KK Adachi's relationship with SonicStar is best characterized as that of an investor and prospective licensee, not as a principal. Therefore, SonicStar's acts pursuant to the agreement cannot be attributed to KK Adachi, and their relationship does not establish that KK Adachi does business in New York.").

In sum, the Court finds that, even construing the Plaintiff's allegations and affidavits as true, the Plaintiff has failed to make a *prima facie* showing of jurisdiction under Section 302(a).

## C. As to Whether the Defendants Caused Injury Within New York State

Alternatively, the Plaintiff seeks to establish jurisdiction over the Defendants pursuant to Section 302(a)(3), which provides that "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . commits a tortious act without the state causing injury to person or property within the state, . . . , if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce."  N.Y. C.P.L.R. 302(a)(3).

In his opposition memorandum, the Plaintiff relies on the latter provision, Section 302(a)(3)(ii). Thus, to survive the Defendants' Rule 12(b)(2) motion, the Plaintiff must make a *prima facie* showing that (1) the Defendants committed tortious activity outside of New York, (2) causing injury in New York, (3) that was reasonably foreseeable to the Defendants, who (4) derived substantial revenue from interstate commerce. See Fantis Foods, Inc. v. Standard Importing Co., 49 N.Y.2d 317, 325, 402 N.E.2d 122, 125 (N.Y. 1980).

The Plaintiff asserts that it has met its burden because (i) the Defendant A&A "breached its fiduciary duties to [the] Plaintiff when it failed to hold [the] Plaintiff's capital contribution and instead invested it into ALTe without otherwise providing for the return of his capital contribution[]"; (ii) the Defendants' breach caused the Plaintiff economic injury in New York; and (iii) the Plaintiffs' injury was foreseeable because the "Defendants engaged in a pattern of tortious behavior designed to harm a plaintiff who it [sic] knows is located in New York." (The Pl.'s Mem. of Law, Dkt. No. 21, at 11–12.).

In response, the Defendants (i) dispute that they owed the Plaintiff a fiduciary duty; and (ii) assert that A&A "had no reasonable expectation that its actions could have consequences in New York[.]" (The Defs.' Reply Mem. of Law, Dkt. No. 24, at 6–7.)

The Court agrees with the Defendants, although for different reasons.

First, the complaint does not state a claim against the Defendant SMS for breach of a fiduciary duty. Rather, the Plaintiff's breach of fiduciary claim is premised on the relationship between A&A and the Plaintiff as a partners in SMS's business, and is addressed solely to A&A. The Plaintiff does assert a claim against SMS for breach of contract. However, breach of contract is not a tort for purposes of Section 302(a)(3). See Ariel Mar. Grp., Inc. v. Pellerin Milnor Corp., No. 88 CIV. 6447 (PKL), 1989 WL 31665, at *4 (S.D.N.Y. Mar. 29, 1989) ("A

breach of contract does not constitute a tortious act within the meaning of CPLR § 302(a)(3).")

(citing Amigo Foods Corp. v. Marine Midland Bank–New York, 39 N.Y.2d 391, 384 N.Y.S.2d

124, 348 N.E.2d 581 (N.Y. 1976)).  Therefore, the Plaintiff does not allege that SMS committed

any *tortious* injury against the Plaintiff, and as a result, the Court cannot exercise jurisdiction

over SMS pursuant to Section 302(a)(3).

Second, with regard to A&A, the Plaintiff does not allege in the complaint, nor in any of

the declarations offered in support of his opposition memorandum, that A&A "derived

substantial revenue from interstate commerce."  N.Y. C.P.L.R. 302(a)(3)(ii).  "[A]s a legal

matter, the substantial interstate commercial revenue requirement is intended to 'narrow[ ] the

long-arm reach to preclude the exercise of jurisdiction over nondomiciliaries who might cause

direct, foreseeable injury within the State but whose business operations are of a local

character.'"  AVRA Surgical Robotics, Inc., 41 F. Supp. 3d at 362 (alteration in original)

(quoting Ingraham v. Carroll, 90 N.Y.2d 592, 599, 665 N.Y.S.2d 10, 687 N.E.2d 1293 (N.Y.

1997)).

The absence of any allegations suggesting what A&A's business is, let alone how much

money it earns from interstate commerce, renders its assertion of jurisdiction under Section

302(a)(3)(ii) deficient.  See Doe v. Delaware State Police, 939 F. Supp. 2d 313, 330-31

(S.D.N.Y. 2013) (finding that the plaintiffs failed to establish a *prima facie* case of jurisdiction

under Section 302(a)(3) because "[they] allege nothing that suggests Seaford PD 'derives

substantial revenue from interstate or international commerce.'"); O'Keefe v. Blue & Gold Fleet,

L.P., 634 F. Supp. 2d 284, 287 (E.D.N.Y. 2009) (Spatt, J) ("Even if the Plaintiff could show that

the alleged negligence caused injury to her in New York, the Plaintiff has failed to demonstrate

that the Defendant derives substantial revenue from New York, solicits business within the state,

or that the Defendant would reasonably expect its ferry services would have consequences in the state.").

Third, even assuming that A&A did derive substantial revenue from interstate commerce, the Plaintiff has not made a *prima facie* showing that A&A caused the Plaintiff injury in New York. "'[C]ourts determining whether there is injury in New York sufficient to warrant § 302(a)(3) jurisdiction must generally apply a situs-of-injury test, which asks them to locate the 'original event which caused the injury.'" Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 209 (2d Cir. 2001) (quoting Bank Brussels Lambert, 171 F.3d at 791). Of importance, "'the situs of the injury is the location of the original event which caused the injury, not the location where the resultant damages are felt by the plaintiff.'" Id. (alteration omitted) (quoting Mareno v. Rowe, 910 F.2d 1043, 1046 (2d Cir. 1990)). Thus, the "'[t]he suffering of economic damages in New York is insufficient, alone, to establish a direct injury in New York for N.Y. C.P.L.R. § 302(a)(3) purposes.'" Troma Entm't, Inc. v. Centennial Pictures Inc., 729 F.3d 215, 218 (2d Cir. 2013) (quoting Penguin Group (USA) Inc. v. American Buddha ('Penguin I '), 609 F.3d 30, 34 (2d Cir. 2010)).

For example, in Whitaker v. Am. Telecasting, Inc., *supra*, the plaintiff asserted that the defendant "committed tortious conduct outside of New York through conspiring with FTI to deprive him of legal fees, with the intent to economically injure him in New York." 261 F.3d at 209. The plaintiff further asserted that "the original event giving rise to his claim of economic harm was his tendering of legal service to FTI in New York." Id. The Second Circuit disagreed, reasoning that "the alleged injury here does not arise out of the legal services provided, but out of ATI's alleged failure to pay for such services." Id. Accordingly, the Circuit Court "agreed with the district court that the relevant, original event which caused the alleged injury was either the

structuring of the partnership sale to avoid payment [to the plaintiff] or the actual withholding of payment to [the [plaintiff], both of which occurred outside New York." Id. (internal quotation marks and citations omitted).

Similarly in AVRA Surgical Robotics, Inc. v. Gombert, *supra*, the plaintiff, a company that did business in New York, asserted breach of fiduciary and misappropriation claims against a former German employee based on allegations that he, among other things, incorporated a competing company in Germany and misappropriated money and clients from the plaintiff for the benefit of his newly-formed German company. 41 F. Supp. 3d at 354–56, 362. The court found that the "situs of injury" for purposes of Section 302(a)(3) belonged in Germany because the original events causing the plaintiff's injuries — namely, the allegedly disloyal acts undertaken by the German defendant — all took place in Germany. See id. at 362.

Here, the Plaintiff seeks to locate the situs of injury in New York because he asserts that "his investment in SMS to [the] Defendants' investment project was the original step in the process that led to his ultimate economic loss." (The Pl.'s Opp'n Mem. of Law, Dkt. No. 21, at 12.). The Court disagrees.

In this case, the Plaintiff's alleged injury is the at least $475,000 in monetary damages that he suffered when the Defendants refused to honor his December 10, 2015 request for a partial refund of his original $530,000 investment. The situs of that injury does not arise out of his April 12, 2012 investment in SMS. Rather, the original event which caused his injury arises from A&A's failure to pay the Plaintiff his refund and its alleged failure to establish sufficient reserves to cover the Plaintiff's refund. Both of these alleged acts took place in Georgia, where A&A's office and principal place of business is located. Accordingly, the Court finds that the "original event" causing the Plaintiff's monetary damages took place in Georgia, not New York.

See Whitaker, 261 F.3d at 209. ("The alleged injury here does not arise out of the legal services provided, but out of ATI's alleged failure to pay for such services.")

In addition, the Court does not find the two cases relied on by the Plaintiff — Bank Brussels Lambert, 171 F.3d at 781 and Mega Tech Int'l Corp. v. Al–Saghyir Establishment, 96-cv-8711 (LBS), 1999 WL 269896 (S.D.N.Y. May 3, 1999) — to be analogous.

In Bank Brussels Lambert, the plaintiff, a Belgium bank with a New York office, obtained a legal opinion as to the validity and enforceability of the security interests it was acquiring in two Puerto Rican oil refineries. 171 F.3d at 782. When the oil refineries later defaulted on the plaintiff's loan and their executives were indicted for bank fraud, the plaintiff brought claims against the law firm in New York on a fraudulent misrepresentation theory, alleging that the firm failed to disclose its knowledge of the precarious financial standing of the two companies in the legal opinion it issued to the plaintiff. See id. at 783–84.

As discussed earlier, the Second Circuit in Bank Brussels Lambert found that the plaintiff had failed to show the court had jurisdiction over the Puerto Rican firm pursuant to Section 302(a)(1) but found that the district erred in finding that there was no jurisdiction under Section 302(a)(3)(ii). See id. at 781. With regard to Section 302(a)(3)(ii), the court found that "although the alleged omissions in this case occurred in Puerto Rico, New York was the place where [the plaintiff] first disbursed its funds to [the defaulting oil companies]." Id. at 792. The plaintiff argued that it disbursed the funds to the oil companies "only because it was unaware of the information" that the defendant had obtained several weeks earlier regarding their financial status. Id. As the "original reliance" on the defendant's alleged misrepresentation took place in New York, the Court found that the "situs-of-injury" was in New York for purposes of Section

302(a)(3).  Id.  However, the Court remanded the case for the district court to determine whether the other requirements for Section 302(a)(3) had been met.  Id. at 793.

By contrast, here, the Plaintiff does not rely on a misrepresentation theory in making his breach of fiduciary claim. For example, he does not allege that he made his original investment in New York in reliance on a representation by the Defendants, as was the case in Bank Brussels Lambert.  Rather, his claim is predicated on acts which occurred *after* he invested his money in SMS — namely, that A&A failed to establish a reserve fund to ensure that it had enough money to pay him a refund; and failed to comply with his December 10, 2015 request for a refund. These were the original events that precipitated his monetary losses, and they took place in Georgia where the Defendants offices are located.  Thus, the Court does not find Lambert to be applicable.  See Whitaker v. Fresno Telsat, Inc., 87 F. Supp. 2d 227, 233 (S.D.N.Y. 1999) ("[The plaintiff's] argument — that the 'first effect of ATI's conduct was located in New York because the bills for services which FTI has refused to pay because of the fraudulent scheme conceived by ATI were to be paid in New York and to date remain unpaid,' Opp. Mem. at 10—is unavailing. If the conspiracy to defraud is the tort, the first or 'original event' is either the structuring of the partnership sale to avoid payment or the actual withholding of payment to Whitaker, both of which occurred outside New York.").

Similarly, in Mega Tech Int'l Corp., *supra*, the plaintiff, a design company, asserted tortious interference with contract claims against a Saudi Arabian company, who it had agreed to work with in preparing a bid and constructing a hospital in Saudi Arabia. 1999 WL 269896 at *1–3.)  According to the complaint, the defendant engaged in a "pattern of tortious behavior," including refusing to loan the plaintiff money for construction expenses as was required under their agreement**;** using intimidation to force the plaintiff to sign a second agreement with the

defendant absolving it of any liability under the first agreement; and failing to forward any of the money it received from the hospital for the work performed by the plaintiff. Id. at *3. In considering whether it had jurisdiction over the defendant under Section 302(a)(3), the district court appeared to conflate the situs-of-injury requirement with the foreseeability requirement. See id. at *9–10. Specifically, the court found that "[g]iven that [the defendant] allegedly engaged in tortious commercial conduct in Saudi Arabia that it should have expected to cause harm to a New York resident and that in fact caused such harm in the State, New York is the situs of the tort under § 302(a)(3)." Id. at 10.

The Second Circuit does not appear to have endorsed the district court's apparent attempt in Mega Tech Int'l Corp. to incorporate the foreseeability requirement into the situs-of-the injury test. Cf. M & M Packaging, Inc. v. Kole, 298 F. App'x 39, 42 (2d Cir. 2008) (Summary Order) ("'[T]he [S]itus of injury for purposes of asserting long arm jurisdiction is the place where the underlying, original event occurred which caused the injury.") (quoting Whitaker, 261 F.3d at 209). Thus, even if the court found Mega Tech Int'l Corp. to be analogous, it would respectfully decline to follow it because it is not binding on this Court and does not appear to be consistent with the current state of the law.

In any event, Mega Tech Int'l Corp. is distinguishable on the facts. In that case, the defendant was in constant contact with the plaintiff and knew that its offices were located in New York. See id. at *9–10. In addition, the defendant engaged in a pattern of willful and tortious behavior that if true, was clearly intended to injure the plaintiff. See id.

By contrast, in this case, it is unclear whether the Plaintiff had ever been in direct contact with A&A. The Plaintiff alleges that A&A ultimately received a copy of his subscription agreement after he signed it on April 12, 2012. However, that communication occurred nearly

three years before December 10, 2015, when the Plaintiff notified A&A that he wished to exercise his right under the Subscription Agreement to request a partial refund of his investment. In the interim period, there is no indication of contacts between the parties, nor any non-conclusory allegations suggesting that A&A was aware of the Plaintiff's residence in New York. Indeed, the only that time the Plaintiff suggested to A&A that he lived in New York was in the April 12, 2012 Subscription Agreement in which he listed his address in Brookville, New York below his signature line. However, the Plaintiff was not then a citizen of New York. Further, in the Agreement itself, the Plaintiff represented to the Defendants that he was making the investment to obtain an EB-5 visa, and he was "not a resident in the United States." (See Tan Decl., Ex. E.) Thus, it is far from obvious where the Plaintiff lived on the basis of the Subscription Agreement, alone.

Accordingly, the Court finds that it is not plausible to conclude that A&A was aware that the Plaintiff was a resident of New York at the time they allegedly breached their fiduciary duties to him, as was the case in Mega Tech Int'l Corp. As a result, in the Court's view, the Plaintiff's injury in New York was not foreseeable to the Defendants.

For these reasons, the Court finds that the Plaintiff has failed to make a *prima facie* showing of jurisdiction under Section 302(a)(3)(ii). As the Court finds that the Plaintiff has failed to meet his burden of establishing jurisdiction under any of the enumerated provisions of New York's long-arm statute, it unnecessary to engage in the federal Due Process inquiry or to address whether venue is proper in this District. See AVRA Surgical Robotics, Inc., 41 F. Supp. 3d at 362 ("Plaintiff has failed to meet its burden of establishing jurisdiction under any of the enumerated provisions of New York's long-arm statute. Accordingly, it is unnecessary to engage in the federal due process inquiry[.]").

### III. CONCLUSION

For the foregoing reasons, the Defendants' motion to dismiss is granted insofar as this

Court does not have personal jurisdiction over the Defendants for the purpose of this action.

Accordingly, the Court dismisses the complaint without prejudice and with leave to renew in a

more appropriate forum.  The Clerk of the Court is directed to close this case.


**SO ORDERED.**
Dated: Central Islip, New York
March 24, 2016


        */s/ Arthur D. Spatt*
        ARTHUR D. SPATT
        United States District Judge